UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ANTHONY BARKER,<br><br>Plaintiff,<br><br>v.<br><br>M. FAROOQ, et.al.,<br><br>Defendants. | Case No. 5:22-cv-00528-SVW-KES<br><br><br>REPORT AND RECOMMENDATION<br>OF U.S. MAGISTRATE JUDGE |

This Report and Recommendation ("R&R") is submitted to the Honorable Stephen V. Wilson, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.

## I.

## INTRODUCTION

Plaintiff Anthony Barker ("Plaintiff"), an inmate in the custody of the California Department of Corrections and Rehabilitation ("CDCR") at the California Institution for Men in Chino, California ("CIM"), filed this pro se litigation against CIM staff members over their early response to COVID-19.  The

Magistrate Judge authorized service on Facility Captain R. Amis and Correctional Officer ("CO") E. Guzman (collectively, "Defendants") in their individual capacity.  (Dkt. 21.)  In March 2024, Plaintiff filed the operative Third Amended Complaint ("TAC").  (Dkt. 62.)  Defendants moved to dismiss the TAC.  (Dkt. 65, the "Motion.")  Plaintiff opposed the Motion (Dkt. 67) and Defendants replied (Dkt. 68).

For the reasons stated below, Defendants' Motion should be GRANTED. Plaintiff's § 1983 claims should dismissed with prejudice.  The Court should decline to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, dismissing those without prejudice but without leave to amend.

## II.

## PROCEDURAL HISTORY

**A.  The Initial Complaint.**

On March 23, 2022, Plaintiff filed a pro se Complaint, alleging violations of 42 U.S.C. § 1983 and state laws by four CIM staff members: (1) M. Farooq, CIM's Chief Medical Executive; (2) K. Torres, CIM's Chief Physician; and (3 and 4) Defendants.  (Dkt. 1.)  Plaintiff generally alleged that CIM staff had created inhumane conditions at the beginning of the COVID-19 pandemic.  (Id.)

On May 17, 2022, the Court screened the Complaint pursuant to 28 U.S.C. §§ 1915(e)(2) and1915A(a).  Finding that the Complaint failed to state a claim for relief, the Court dismissed the Complaint with leave to amend.  (Dkt. 9.)

**B.  The First Amended Complaint.**

On July 6, 2022, Plaintiff filed a First Amended Complaint ("FAC") alleging civil rights violations and state law claims against the same four CIM staff members.  (Dkt. 15).  On August 22, 2022, the Court screened the FAC and partially dismissed the FAC with leave to amend.  (Dkt. 18).  The Court explained that Plaintiff could either (1) amend to try to state a claim against all four staff members, (2) voluntarily dismiss Farooq and Torres, at which point the Court

2

would authorize service on Amis and Guzman, or (3) dispute the Magistrate Judge's screening determinations.  (Id. at 7.[1])  On September 8, 2022, Plaintiff voluntarily dismissed Farooq and Torres and his "denial of medical care claims against all Defendants."  (Dkt. 19 at 1.)

On March 20, 2023, Defendants Amis and Guzman moved to dismiss the FAC on the grounds that it failed to state a cognizable claim for relief and that they were entitled to qualified immunity.  (Dkt. 42.)  The Court issued a scheduling order which set a deadline for Plaintiff to oppose the motion or, alternatively, file a Second Amended Complaint ("SAC").  (Dkt. 43.)

On March 22, 2023, Plaintiff moved for leave to file a SAC.  (Dkt. 44.)  The Court granted Plaintiff's motion on March 30, 2023.[2]  (Dkt. 45.)  Nevertheless, on April 4, 2023, Plaintiff opposed Defendants' motion to dismiss the FAC.  (Dkt. 46).

**C.   The Second Amended Complaint.**

Plaintiff filed a SAC on April 17, 2023, alleging civil rights violations and state law claims against the same four CIM staff members in their individual and official capacities.  (Dkt. 47.)  On April 20, 2023, based on the SAC's filing, the Court denied the motion to dismiss the FAC as moot.  (Dkt. 48.)

On May 9, 2023, Defendants moved to dismiss the SAC and strike all allegations against Farooq and Torres.  (Dkt. 50.)  The Court granted the motion, dismissing some claims without leave to amend (i.e., all official capacity claims and all § 1983/Eighth Amendment "deliberate indifference to medical needs" claims) and others with leave to amend (i.e., § 1983/Eighth Amendment

---

[1] Citations refer to the pagination imposed by the Court's e-filing system.

[2] The Court stated, "Plaintiff may amend his complaint however he sees fit to address the concerns raised in his motion for leave to amend and in Defendants' motion to dismiss.  By granting leave to amend, the Court is not ruling on the merits of any proposed amendments."  (Dkt. 45.)

"inhumane conditions of confinement" claims and state law intentional infliction of emotional distress ("IIED") and negligence claims).  (Dkt. 54, 59.)

**D.  The Third Amended Complaint.**

In March 2024, Plaintiff filed the operative TAC.  (Dkt. 62.)  The TAC alleges the following claims:

1. Section 1983/Eighth Amendment "inhumane conditions of confinement" claims against Defendant Amis (Dkt. 62 at 6-16):

   a. Housing Claim: Defendant Amis housed Plaintiff in a crowded dormitory and failed to move him to cell housing until December 2020 (id. at 12); and

   b. Cleaning Supplies Claim: Defendant Amis failed to provide Plaintiff with sufficient cleaning supplies (id. at 14-15).

2. Section 1983/Eighth Amendment "inhumane conditions of confinement" claim against Defendant Guzman (id. at 16-19):

   a. Mask Claim: On one occasion around March 31, 2020, Defendant Guzman saw Plaintiff exiting the Facility-A dining area and told him to remove his personal cloth face covering, which Plaintiff did (id. at 16-17).

3. IIED claim against Defendants (id. at 20-23); and

4. Negligence claim against Defendants (id. at 23-27).

On these claims, Plaintiff seeks $10,000 in compensatory damages and $25,000 in punitive damages against each Defendant.  (Id. at 29.)

**E.  The Motion to Dismiss.**

As reasons to dismiss Plaintiff's § 1983 claims, Defendants argue that Plaintiff has not alleged facts sufficient to show that they (1) acted with deliberate indifference toward his safety or prison conditions or (2) caused him to get COVID-19.  Alternatively, they argue that they are entitled to qualified immunity. (Dkt. 65 at 2.)  They also argue that since Plaintiff has had multiple opportunities

to amend and the facts are clear, the Court should dismiss Plaintiff's federal claims without further leave to amend.  (Id. at 31.)

Regarding Plaintiff's state law claims, Defendants urge the Court to decline to exercise supplemental jurisdiction and dismiss them without prejudice.  (Id. at 2.)

## III.

## SUMMARY OF FACTUAL ALLEGATIONS[3]

In early 2020, Plaintiff was housed in a Facility-A dormitory at CIM.  (Dkt. 62, TAC at 8.)  Facility-A is designated for inmates with high medical risks.  (TAC at 8 n.1.)  Facility-A has eight dorms.  (Id. at 9.)  Plaintiff's dorm had 190 beds. (Id. at 13 n.4.)  In April-May 2020, it was populated with about 157 inmates.  (Dkt. 47 at 7-8.)

Plaintiff suffers from "Chronic Obstructive Pulmonary Disease ('COPD'), hypertension, pre-type II diabetes, and increased age."  (Dkt. 47 at 6, 35-36.) These conditions increased his risk of severe illness from COVID-19.  (Id. at 6, 9.) Defendant Amis is the Facility-A captain.  (Id. at 4.)  Plaintiff alleges that Defendant Amis knew he had these health conditions and knew that they placed him at risk of severe illness from COVID-19.  (Id. at 7.)

On February 10, 2020, Plaintiff submitted a written grievance that asked Dr. Torres, "Why won't you compel your medical staff to take some precautions to prevent the spread of COVID-19?"  (Dkt. 15 at 31.)  On March 25, 2020, unidentified members of Facility-A's medical staff "refused to provide [Plaintiff] a face mask."  (Dkt. 15 at 30.)

"A few days later," while exiting Facility-A culinary, Defendant Guzman saw Plaintiff wearing a bandana face covering.  He ordered Plaintiff to remove it

---

[3] To present a complete picture, the Court cites to the TAC as well as allegations and exhibits from prior complaints.

and told him that he was not allowed to wear it.  (TAC at 17; see also Dkt. 1 at 8 and Dkt. 15 at 30 (alleging this incident occurred on March 31, 2020).)  Plaintiff explained that he was at increased risk of severe illness from COVID-19, that medical staff had denied his request for a CIM-issued face mask, and that another correctional officer had told him that he could wear a cloth face covering.  (TAC at 17.)  In response to these explanations, Defendant Guzman continued to order Plaintiff to remove the bandana.  (Id.)  Plaintiff feared discipline if he failed to follow Defendant Guzman's order, so he removed the bandana.  (Id.)  At that time, "other officers and prisoners were wearing personal cloth face coverings."  (Id. at 18.)  Plaintiff admits, however, "it was unclear whether cloth face masks were particularly effective in curbing the spread of the virus."  (Id. at 19.)

On April 1, 2020, Plaintiff filed a medical interview request about this incident.  (Dkt. 15 at 30.)  He asked "medical to provide [him] a facemask."  (Id.)

On April 3, 2020, Plaintiff filed a second interview request about this incident, this one directed at Defendant Guzman.  (Dkt. 62-1 at 7.)  He asked, "What rule prohibits the use of facemasks?"  This interview request was forwarded to Nurse Payne.  (Id.)

At some point before April 11, 2020, Defendant Amis moved fifteen inmates from Plaintiff's dormitory into cell housing.  (TAC at 7 (alleging the move happened before Plaintiff contracted COVID-19) and at 24 (alleging the move happened "in March-April 2020").)  Defendant Amis selected the inmates who were moved first from a list of eligible inmates created by CIM's warden and chief medical executive.  (Id. at 7, 9.)  The initial move involved fifteen inmates from each of the eight Facility-A dormitories, or about 120 inmates.  (Id. at 9.)  A few days after this move, Plaintiff asked Defendant Amis when he and the others still in the dormitory would be moved to cell housing.  (Id.)  She told him that they "should be moved with the next group and to be patient."  (Id.)

On April 11, 2020, Nurse Payne interviewed Plaintiff.  (Dkt. 62-1 at 7.)  She

asked what Plaintiff wanted her to do about the mask situation with Defendant Guzman. (TAC at 16.) Instead of asking her to provide medical authorization for wearing a cloth face covering, Plaintiff said that he wanted Guzman to respond and identify the applicable rule. (Id.) Nurse Payne said that she would forward the request to Facility-A Captain Amis to give to Guzman. (Id.) Nurse Payne wrote, "Medical is good." (Dkt. 62-1 at 7.) Plaintiff agrees that he was "feeling well" when he spoke with Nurse Payne on April 11, 2020. (TAC at 16; Dkt. 47 at 14 (alleging April 11, 2020, was "prior to symptoms of COVID").) However, he because "seriously ill" later that evening. (TAC at 16.) Plaintiff contends that he was seriously ill with COVID-19 by the evening of April 11, 2020. (Compare id. at 19 n.4, with Dkt. 1 at 6 (alleging his COVID-19 infection started "around April 5, 2020").) Plaintiff alleges that "everyone in [his] unit was exhibiting serious COVID symptoms during the entire month of April 2020." (TAC at 12.) Indeed, in April 2020, CIM had the worst outbreak of COVID-19 within the CDCR.[4] (Dkt. 47 at 9.)

On April 25, 2020, CIM issued face masks to inmates. (Dkt. 47 at 15.) On April 28, 2020, Defendant Amis wrote a response to Plaintiff confirming, "You have been issued 3 masks that are required to be worn." (Dkt. 62-1 at 7.)

On May 1, 2020, CIM collected a sample from Plaintiff to be tested for COVID-19. (Id. at 5.) On May 4, 2020, verified results came back showing that Plaintiff had tested positive. (Id.)

Having tested positive, Plaintiff was not moved to cell housing with the next group of inmates. Instead, he remained in the dormitory that later was classified as a quarantine unit for Facility-A. (Dkt. 47 at 7.) Inmates housed there were "both

---

[4] "CIM suffered a severe outbreak [of COVID-19], which by late May [2020] had killed at least nine inmates and infected over six hundred." Hampton v. California, 83 F.4th 754, 759 (9th Cir. 2023).

infected and uninfected." (Id. at 8.)  Dr. Farooq directed this "in an irresponsible and unethical attempt to achieve what prison officials called 'herd immunity.'" (Dkt. 15 at 7-8.)

Plaintiff was eventually offered cell housing in December 2020.  (TAC at 9, 12.)  The "script" that he signed on December 16, 2020, gave inmates information about their choice to move to cell housing.  (Dkt. 62-1 at 3, the "Script".)  In relevant part, the Script explained:

> Many people, especially those who are younger and have no medical problems, are able to fight the COVID-19 virus and do not get very sick.  But some people who are older, or who have medical problems, are at a higher risk of getting very sick or even dying if they catch the virus.  We are worried about you because of [you age/your medical problems].

(Id.)  The Script warned inmates that they needed to ask questions and make the choice "as soon as possible because the cells may run out." (Id.)

Plaintiff continues to suffer from long COVID-19 symptoms, including "cognitive dysfunction, emotional distress, brain fog, chronic anxiety, and chronic depression." (Dkt. 47 at 19.)  Starting in December 2021, and continuing through at least May 11, 2022, Plaintiff has requested and received mental health care at CIM.  (Id. at 19-21, 28 [on December 27, 2021, Plaintiff submitted a CDCR 7362 form requesting health care services, stating: "I am experiencing emotional distress and anxiety due to long COVID (Coronavirus)."].)

**IV.**

**LEGAL STANDARDS FOR MOTIONS TO DISMISS**

A Rule 12(b)(6) motion to dismiss tests whether the allegations in the complaint are sufficient state a claim for relief.  A complaint may be dismissed for failure to state a claim for two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory.  Balistreri v.

8

Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990), as amended May 11, 1990.

In determining whether a complaint states a claim, the court assumes that the allegations of material fact in the complaint are true and construes them in the light most favorable to the plaintiff. Rosati v. Igbinoso, 791 F.3d 1037, 1039 (9th Cir. 2015). Where the plaintiff appears pro se, courts must construe the allegations of the complaint liberally and afford the plaintiff the benefit of any doubt. Karim-Panahi v. Los Angeles Police Dep't, 839 F.2d 621, 623 (9th Cir. 1988). However, "the liberal pleading standard … applies only to a plaintiff's factual allegations." Neitze v. Williams, 490 U.S. 319, 330 n.9 (1989). "[A] liberal interpretation of a civil rights complaint may not supply essential elements of the claim that were not initially pled." Bruns v. Nat'l Credit Union Admin., 122 F.3d 1251, 1257 (9th Cir. 1997) (quoting Ivey v. Bd. of Regents, 673 F.2d 266, 268 (9th Cir. 1982)).

In deciding a motion to dismiss under Rule 12(b)(6), a court generally may not look outside the pleadings without converting the motion into a motion for summary judgment. Anderson v. Angelone, 86 F.3d 932, 934 (9th Cir. 1996). Courts may, however, consider material that is properly subject to judicial notice. Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001), overruled on other grounds by Galbraith v. County of Santa Clara, 307 F.3d 1119, 1125-26 (9th Cir. 2002). A court may also consider the exhibits attached to the complaint. Rouse v. United States Dep't of State, 548 F.3d 871, 879 n.10 (9th Cir. 2008), amended on other grounds, 567 F.3d 408 (9th Cir. 2008).

**V.**

**SECTION 1983 CLAIMS**

To state a § 1983 claim against Defendants in their individual capacity, Plaintiff must allege facts showing that: (1) Defendants acted under color of state law, and (2) Defendants deprived Plaintiff of a constitutional right. Jones v. Community Redevelopment Agency, 733 F.2d 646, 649 (9th Cir. 1984). In this

case, Defendants were clearly acting under color of state law in their role as correctional staff at CIM.  The important question, therefore, is whether Plaintiff has alleged sufficient facts that, if accepted as true, show that Defendants deprived him of a constitutional right.

    **A. <u>Eighth Amendment "Inhumane Conditions of Confinement" Claims.</u>**

        **1. Legal Elements.**

    "[T]he Eighth Amendment applies to conditions of confinement that are not formally imposed as a sentence for a crime." <u>Helling v. McKinney</u>, 509 U.S. 25, 29 (1993).  The Supreme Court has recognized that the Eighth Amendment "requires that inmates be furnished with the basic human needs, one of which is 'reasonable safety,'" and "[i]t is "cruel and unusual punishment to hold convicted criminals in unsafe conditions." <u>Id.</u> at 33 (citations omitted).

    Such Eighth Amendment claims are analyzed via a two-pronged inquiry. <u>Id.</u> at 35-37.  Under the first, objective prong, the prisoner must establish that "society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk.  In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." <u>Id.</u> at 36.  The second, subjective prong "requires an inquiry into the prison officials' state of mind" based on the "deliberate indifference" standard.  <u>Id.</u> at 32.  A prison official is deliberately indifferent if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994).  Under this standard, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." <u>Id.</u> at 844.

    Put differently, allegations that show a less-than-ideal—but still reasonable

under difficult circumstances—response to a medical crisis do not support a claim for deliberate indifference.  Rather, a plaintiff must allege facts showing that the defendants' course of action (or non-action) was "medically unacceptable under the circumstances" and that the defendants "chose this course in conscious disregard of an excessive risk to plaintiff's health." Colwell v. Bannister, 763 F.3d 1060, 1068 (9th Cir. 2014) (citations omitted).  In the specific context of COVID-19, "there is a general consensus [among federal courts] that a prisoner states a cognizable Eighth Amendment claim if the prisoner can sufficiently allege that a defendant knew of the risks of COVID-19 and had authority to mitigate the risks, yet did nothing to mitigate those risks." Jones v. Sherman, No. 21-01093, 2022 U.S. Dist. LEXIS 44156 at *16, 2022 WL 783452 at *7 (E.D. Cal. Mar. 11, 2022), adopted by 2022 U.S. Dist. LEXIS 166064, 2022 WL 4238875 (E.D. Cal. Sept. 14, 2022).  In examining whether prison officials subjectively acted with deliberate indifference to the risk of COVID-19, the key inquiry is not whether the officials responded effectively; instead, the key inquiry is whether they "responded reasonably to the risk" given the available options. Benitez v. Sierra Conservation Ctr., No. 21-00370, 2021 U.S. Dist. LEXIS 170489 at *13, 2021 WL 4077960 at *5 (E.D. Cal. Sept. 8, 2021), report and recommendation adopted, 2021 U.S. Dist. LEXIS 193507, 2021 WL 4593841 (E.D. Cal. Oct. 6, 2021).

In a § 1983 action, the plaintiff must also plead facts showing that the defendant's conduct caused the claimed injury. Harper v. City of L.A., 533 F.3d 1010, 1026 (9th Cir. 2008); see also Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1987) ("The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation.") (citations omitted).

### 2. The Objective Prong.

In a prior screening order, the Court cited decisions finding that the risk of COVID-19 infection is a substantial risk of serious harm to an inmate who alleges

suffering from pre-existing health conditions.  (Dkt. 9 at 5-6); <u>see</u> <u>also</u> <u>Benitez</u>,

No. 21-00370, 2021 U.S. Dist. LEXIS 170489 at *13, 2021 WL 4077960 at *5

("The transmissibility of the COVID-19 virus in conjunction with Plaintiff's living

conditions, which he alleges were overcrowded and poorly ventilated, are

sufficient to satisfy the objective prong, i.e., that Plaintiff was 'incarcerated under

conditions posing a substantial risk of serious harm.'").  The Motion does not

argue that Plaintiff's housing-related § 1983 claims fail to satisfy the objective

prong by alleging exposure to a serious risk of harm.  (Dkt. 65 at 16-17.)

### 3.  The Housing Claim's Subjective Prong

Plaintiff alleges that Defendant Amis exposed Plaintiff to inhumane prison

conditions *before* April 11, 2020 (the date he contracted COVID-19), by housing

him in a dormitory with inmates of mixed COVID-19 infection status rather than

cell housing.  These conditions allegedly caused Plaintiff to contract COVID-19

around April 11, 2020, test positive based on a May 1, 2020 sample, and ultimately

develop symptoms of long COVID.

> a.  The Court's Prior Order Dismissing this Claim.

The Court previously dismissed this claim, reasoning as follows:

> Plaintiff does not allege that Defendant Amis did nothing in
> response to the threat of COVID-19 infection in March 2020.  Rather,
> he alleges that Defendant Amis used "criteria" to select over 100
> inmates for transfer to available single cells.  (SAC at 10-11.)  Given
> that CIM is "one of three CDCR institutions that house high-risk
> medical patients," it is unsurprising that many CIM inmates would be
> at risk of serious illness from COVID-19 infection.  <u>Taylor v. Borders</u>,
> No. CV 18-02488 TJH-AGRx, 2022 WL 17078903, 2022 U.S. Dist.
> LEXIS 212872, at *2 (C.D. Cal. Apr. 15, 2022).

> Plaintiff fails to plead facts sufficient to show that Defendant
> Amis was deliberately indifferent to Plaintiff's risk of contracting

12

1    COVID-19.  First, Plaintiff's allegations that Defendant Amis knew

2    Plaintiff satisfied the "criteria" for an immediate move to single-cell

3    housing is speculative.  Plaintiff does not allege what criteria

4    Defendant Amis used, how Plaintiff learned the criteria, or how

5    Defendant Amis knew that Plaintiff met the criteria.

6         Second, Plaintiff's allegations, even if accepted as true, do not

7    show that Defendant Amis responded unreasonably to COVID-19 by

8    not immediately moving Plaintiff to a single cell.  Plaintiff alleges

9    neither that Defendant Amis relied on unreasonable criteria nor

10   misapplied the criteria to select the inmates who received single cells

11   first.  He does not allege any facts about how many single cells were

12   available or why he believes (if he does) that his health conditions

13   were more serious than those of the over 100 other inmates whom

14   Defendant Amis *did* move starting in March 2020.

15   (Dkt. 54 at 13-14.)  Plaintiff attached to the SAC a medical record from February

16   2019 indicating that he has only "mild" COPD that has never required

17   hospitalization or oral steroids and "is not affecting his ability to perform his

18   regular physical activities."  (Dkt. 47 at 35.)

19        The Court also noted the role of expert medical advice in Defendant Amis's

20   decision-making as a facility captain, as follows:

21        If Defendant Amis, who is not a doctor, was being told very

22   early in the pandemic by CIM's Chief Medical Executive that public

23   health conditions at CIM would improve through the rapid

24   development of herd immunity, then Defendant Amis cannot

25   reasonably have been expected to second-guess that medical advice.

26   Someone whose response to COVID-19 was well-meaning but

27   ineffective or even harmful does not satisfy the subjective prong of

28   deliberate indifference.  See Barnett v. Gastelo, No. 2:22-cv-04070-

13

RGK-JDE, 2022 U.S. Dist. LEXIS 167703, 2022 WL 4292344, *5
(C.D. Cal. Aug. 22, 2022), R&R adopted, 2022 WL 4291323 (Sept.
14, 2022) (finding claim that warden implemented dorm cohorts and
failed to reduce inmate population in response to COVID-19 did not
state cognizable Eighth Amendment claims).

(Dkt. 54 at 15.)

b.     Plaintiff's New Allegations.

In an effort to allege facts showing deliberate indifference, Plaintiff now
makes some contradictory claims.  First, he alleges that the "criteria" Defendant
Amis used to select the first fifteen inmates moved into cell housing is found in the
Script.  (TAC at 10 (citing TAC "Ex. A" as providing the criteria).  But Exhibit A
is the Script Plaintiff signed on December 16, 2020, and Plaintiff never alleges it
existed in March 2020.  (Dkt. 62-1 at 3.)  In any event, the Script is written in
general terms to help inmates decide if they want to move to less social and more
restrictive housing because they fear COVID-19 infection.  (Id.)  It does not
contain any "criteria" that would have helped correctional staff like Defendant
Amis prioritize between moving CIM's high-risk inmates with asthma, cancer,
Valley Fever, COPD, uncontrolled diabetes, etc.

Plaintiff alleges, "The criteria for cell housing did not require nor even
remotely suggest that the 'degree' of a prisoner's pre-existing medical condition
was a determining factor on who would be moved to cell housing or the order in
which they would be moved."  (Id. at 10, citing Ex. A.)  In other words, according
to Plaintiff, Defendant Amis was not allowed to consider and prioritize inmates
based on the degree of their medical fragility.  According to Plaintiff, the only
reasonable, constitutional response to was for her to move *everyone* at high

medical risk in Facility-A (which was everyone) into cell housing.[5]  Plaintiff alleges that she could have (and thus should have) moved all 157 inmates to cell housing because there were 200 cells available in Facility-C and 150 available in Facility-B.  (Id. at 10.)  Of course, these allegations ignore that there were also high-risk medical inmates in Facility-B and Facility-C who needed those cells.[6]  It was not unreasonably (and thus not unconstitutional) for correctional staff leaders like Defendant Amis to provide cell housing to the most vulnerable inmates first.

Plaintiff's allegations also ignore that, while Plaintiff was not in the first group moved in April, he might have been in the second group moved in May had he not tested positive so early.  Once he tested positive, Plaintiff cannot allege facts showing that Defendant Amis acted unreasonably in deciding to house him with others who had also tested positive.  Given the medical advice she received from CIM's medical staff about herd immunity (TAC at 12-13), Defendant Amis could reasonably have believed that Plaintiff, once he recovered from his initial infection, could not be re-infected and was the lowest-risk sort of inmate to keep in dormitory housing.

Changing theories, Plaintiff alleges that Defendant Amis "misapplied the criteria to move those at increased risk of COVID-19 to cell housing."  (Id. at 10.)  Instead of assessing their medical risk, she chose the inmates she wanted to move

---

[5] Plaintiff alleges that dormitory housing was inhumane because persons of mixed COVID-19 infection status were housed together.  (TAC 7-11, 13.)  But Plaintiff's own allegations demonstrate how it would have been impossible for Defendants to avoid such mixing so early in the COVID-19 pandemic unless they eliminated all dormitory housing.  Plaintiff alleges that he was fine the afternoon of April 11 but "seriously ill" just a few hours later.  (Compare TAC at 16, with TAC at 19 n.4.)

[6] On May 30, 2020, CIM transferred 122 inmates with high-risk medical conditions to San Quentin in an "attempt to prevent further harm to CIM inmates."  Hampton v. California, 83 F.4th 754, 759 (9th Cir. 2023).

even though she "did not have that discretion." (Id.)  Plaintiff alleges that, while CIM Facility-A was a designated facility for high-risk medical inmates, not every inmate was at increased risk of developing serious illness from COVID-19 infection. (Dkt. 62 at 8. n.1.)  For example, many inmates at CIM were moved there after they contracted Valley Fever at other CDCR locations.  (Id.; Dkt. 47 at 35.)  Plaintiff alleges that Defendant Amis should have prioritized moving him, an inmate with "mild" COPD, over moving inmates with Valley Fever because their medical condition did not "warrant cell housing." (Dkt. 62 at 8. n.1.)  Valley Fever, however, can cause lung scarring.  See United States v. Reid, No. 17-00175, 2020 U.S. Dist. LEXIS 78953 at *9, 2020 WL 2128855 at *3 (N.D. Cal. May 5, 2020) (recognizing the seriousness of Valley Fever and noting that "[c]hronic lung disease increases a person's risk of getting severely ill from COVID-19").  Plaintiff has not even identified the first fifteen inmates moved, let alone alleged any facts showing that Defendant Amis acted unreasonably by considering those inmates to be at greater medical risk than Plaintiff.

Next, Plaintiff alleges that Defendant Amis should have been working to provide single-cell housing as early as *November 2019* because the COVID-19 outbreak really started then.  (Dkt. 62 at 11 n.3.)  Plaintiff alleges no facts to support this speculative allegation.  The Court takes judicial notice that the first documented case of COVID-19 in the United States occurred on January 20, 2020. See Center for Disease Control COVID-19 Timeline at https://www.cdc.gov/museum/timeline/covid19.html, last visited July 19, 2024. California Governor Gavin Newsom did not proclaim a state of emergency due to COVID-19 until March 4, 2020.  Hampton v. California, 83 F.4th 754, 759 (9th Cir. 2023).  "COVID-19 was not a reasonably foreseeable risk [in correction settings] in December 2019."  Phillips v. City of Los Angeles, No. 21-00363, 2022 U.S. Dist. LEXIS 73552 at *9, 2022 WL 1193265 at *3 (C.D. Cal. Mar. 21, 2022).

In a final effort to state a claim against Defendant Amis, Plaintiff alleges

extreme facts that are contradicted elsewhere in the TAC.  For example, he alleges that the crowded Facility-A dormitories were inhumanely dangerous because they had "no cleaning products" for the living quarters.  (TAC at 7, 11)  The FAC also admits, however, that Defendant Amis oversaw the ordering cleaning supplies, inmates received some soap and hand sanitizer, and "housing was cleaned …twice a day." (Id. at 14-15.)  Plaintiff alleges that CIM "failed to provide [him] with a face mask. (Id. at 7.)  But CIM issued him three masks in April 2020.  (Dkt. 62-1 at 7.)  Plaintiff alleges that there was "no COVID testing." (Id. at 7.)  But Plaintiff was tested on May 1, 2020.  (Id. at 12, 16; Dkt. 62-1 at 5.)  Plaintiff alleges that his dormitory was too crowded to practice social distancing, but when Defendant Amis moved some inmates out of the dormitory, Plaintiff claims this "did absolutely nothing." (Dkt. 62 at 25.)

At worst, Plaintiff's allegations show that Defendant Amis, using some health-related criteria, determined in March or early April of 2020 that fifteen other CIM inmates from Plaintiff's Facility-A dormitory were at an even higher risk of severe illness from COVID-10 than Plaintiff.  She decided to move those inmates to cell housing.  Once Plaintiff tested positive on May 4 and recovered, she reasonably decided not to prioritize moving him to cell housing.  A claim for deliberate indifference must be based on more than a disagreement over which of several reasonable choices to make.  Plaintiff has not alleged facts showing that before April 11, 2020, Defendant Amis caused inhumane conditions of confinement to exist at CIM via a deliberately indifferent response to COVID-19.

### 4.  The Cleaning Supplies Claim's Subjective Prong

a.      The Court's Prior Order Dismissing this Claim.

The Court previously dismissed this claim, reasoning as follows:

First, it is unclear if Plaintiff means that (1) inmates received the normal cleaning supplies they had received before the pandemic, but those supplies were used up cleaning their own cells, leaving

nothing for cleaning the common areas; or (2) inmates did not even receive their normal cleaning supplies.  Second, Plaintiff does not allege that Defendant Amis had personal responsibility for ordering or distributing cleaning supplies.  Plaintiff does not even allege that Defendant Amis knew about the lack of cleaning supplies.  Without such allegations, there is no causal connection between Defendant's acts or omissions and the alleged harm.  Third, Plaintiff's allegations concern events at the very beginning of the pandemic.  It would be unreasonable to expect prison officials to have already obtained additional funding, ordered, and received extra cleaning supplies.  If Defendant Amis lacked a reasonable ability to provide cleaning supplies (or extra cleaning supplies) during March and April of 2020, then her failure to do so was not deliberately indifferent.  Fourth, Plaintiff does not allege whether porters or others were cleaning the dormitory's common areas, even if Plaintiff did not receive cleaning supplies himself.  If others cleaned the common areas, then Defendant Amis's failure to give Plaintiff cleaning supplies would not have contributed to causing Plaintiff to contract COVID-19.

(Dkt. 54 at 15-16.)

> b.    Plaintiff's New Allegations.

In the TAC, Plaintiff explains that once every month, "Defendant Amis's clerk collected the CDCR 115 Order Sheets (i.e., for cleaning supplies and toiletries) from each dormitory … and gave them to Defendant Amis for review of the amounts being ordered."  (TAC at 14.)  She was responsible for confirming that supplies purchased were actually received by Facility-A.  (Id.)  She also could submit emergency orders.  (Id.)

She "provided cleaning supplies for prisoners to clean their living quarters" but only after Plaintiff was injured by COVID-19 (i.e., after April 11, 2020).

(TAC at 15.)  After April 11, 2020, Plaintiff and the other inmates in the dormitory received a bar of soap and a small tube of hand sanitizer.  (<u>Id.</u>)  She said she would provide these supplies to inmates "once weekly," but Plaintiff thought that she "never ordered enough" because somehow the supplies would run out before Plaintiff received them.  (<u>Id.</u> at 15.)  Plaintiff alleges, "she should have ensured each housing was cleaned more than the usual twice a day."  (<u>Id.</u>)

> c.   Analysis.

Plaintiff's new allegations still do not demonstrate deliberate indifference by Defendant Amis.  Rather, Plaintiff describes a correctional captain who was following normal procedures for ordering cleaning and hygiene supplies that had been adequate under normal circumstances but who needed to adjust those procedures once the risk of COVID-19 infection and strategies for combatting it became known.  While Defendant Amis *did* eventually adjust by ordering more soap and more sanitizer once she knew COVID's risks, she did not change the monthly orders for February or March 2020.  Given the uncertainties in the early days of the COVID-19 pandemic and the difficulty obtaining supplies like hand sanitizer, this slight delay in changing how she ordered and distributed cleaning supplies does not state a claim for deliberate indifference.

### 5.  The Mask Claim's Subjective Prong.

Plaintiff alleges that on or about March 30, 2020, Defendant Guzman exposed Plaintiff to an inhumane risk by ordering Plaintiff to remove a bandana that he was wearing as a face covering as he was leaving the Facility-A culinary facility. (TAC at 17-18.)

> a.   The Court's Prior Order Dismissing this Claim.

Defendants previously argued that Defendant Guzman ordering Plaintiff to remove his face covering temporarily on one occasion – an occasion just after Plaintiff had been eating with other inmates unmasked – did not sufficiently allege facts meeting the objective prong.  Plaintiff responded to this argument by offering

to allege additional facts, i.e., that he "was so frightened of Defendant Guzman's threat of disciplinary action that he decided not to wear the bandana again and wait for CIM to issue medically approved face masks." (Dkt. 54 at 17, citing Dkt. 52 at 11-13.)

Defendants previously argued that Defendant Guzman's actions did not satisfy the subjective prong because he merely enforced a pre-pandemic CDCR rule against inmates wearing masks and "it was unclear in March 2020 that the health benefits of masking outweighed the security risks in a prison environment." (Dkt. 54 at 17, citing Dkt. 50 at 22-23.) Again, Plaintiff responded to this argument by referring to new facts, such as that Defendant Guzman knew there was no such rule being enforced. (Id., citing Dkt. 52 at 11-13.)

The Court granted Plaintiff leave to file a TAC adding these new facts. (Id.)

     b. New Factual Allegations.

Plaintiff alleges that he visited Facility-A's medical clinic on March 25, 2020, and was told that the clinic would not provide a face mask. (Dkt. 62 at 16-17.) Nevertheless, CO Whitaker, who was present, told Plaintiff that he was "allowed to wear a personal cloth face covering … until CIM provided face masks." (Id. at 17.) It was just "a few days" after this when Defendant Guzman told Plaintiff that he was not allowed to wear a cloth face covering "at any time." (Id.) Plaintiff told him that CO Whitaker had authorized him to wear the bandana for medical reasons. (Id.) Defendant Guzman nevertheless ordered him to remove the bandana and threatened disciplinary action if Plaintiff did not comply. (Id.) Defendant Guzman could see that "other officers and prisoners were wearing personal cloth face coverings, yet he singled Plaintiff out." (Id. at 18.)

Plaintiff complained about this incident. About eleven days later, Nurse Payne interviewed him. (Id. at 16.) Instead of asking Nurse Payne for written medical authorization to wear a face covering, he insisted that Defendant Guzman needed to respond to his grievance. (Id.) Plaintiff thought that Defendant Guzman

1   was "anti-COVID and to any mandates thereto." (Id. at 18.)  Plaintiff admits it

2   was unclear in March 2020 "whether cloth face masks were particularly effective

3   in curbing the spread" of COVID-19.  (Id. at 19.)

4                            c.       Analysis.

5           The facts added by Plaintiff still fall short of satisfying the subjective prong

6   of deliberate indifference.  There are obvious security reasons why, under normal

7   circumstances, prisons would not want inmates to be masked.  The incident with

8   Defendant Guzman happened in March 2020.  Defendant Guzman could not have

9   known that requiring inmates (who were already eating together unmasked) to

10  remove their face coverings in other common areas of the prison would expose

11  those inmates to a serious risk of contracting COVID-19.  See Kesling v. Tewalt,

12  476 F. Supp. 3d 1077, 1088 (D. Idaho Aug. 4, 2020) ("That prison officials did not

13  require face masks for the first months of the pandemic does not establish

14  deliberate indifference …. At first, it was unclear whether cloth face masks would

15  be particularly effective in curbing the spread of the virus.").  He could not have

16  known that Plaintiff—who had access to medical staff and could request medical

17  authorization to wear a mask—would not do so if the issue were truly important to

18  Plaintiff.

19     **B. <u>Qualified Immunity.</u>**

20          In determining whether an officer is entitled to qualified immunity, district

21  courts consider: (1) whether there has been a violation of a constitutional

22  right; and (2) whether that right was clearly established at the time of the officer's

23  alleged misconduct.  Lal v. Cal., 746 F.3d 1112, 1116 (9th Cir. 2014) (citation

24  omitted).  The Court has already determined above that the TAC's allegations do

25  not allege facts sufficient to show a violation of Plaintiff's constitutional rights.  As

26  an alternative basis for granting Defendants' motion, the Court also finds that, in

27  March or April 2020, no clearly established law informed Defendants that their

28  actions were unconstitutional.

1          a.      Relevant Law.

2          Qualified immunity is a fact intensive determination.  See <u>Saucier v. Katz</u>,

3    533 U.S. 194, 201 (2001).  The relevant facts must be ascertainable by the Court so

4    that it may examine the reasonableness of the defendants' behavior.  See <u>Grotfen v.</u>

5    <u>California</u>, 251 F.3d 844, 851 (9th Cir. 2001) (declining to find qualified immunity

6    when ruling on a Rule 12(b)(6) motion).    Still, the United States Supreme Court

7    has repeatedly stressed the importance of resolving immunity questions at the

8    earliest possible stage in litigation.  <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991)

9    (per curiam); <u>Pearson v. Callahan</u>, 555 U.S. at 231-32.

10          "Qualified immunity balances two important interests—the need to hold

11   public officials accountable when they exercise power irresponsibly and the need

12   to shield officials from harassment, distraction, and liability when they perform

13   their duties reasonably." <u>Pearson v. Callahan</u>, 555 U.S. at 231.  "The purpose of

14   qualified immunity is to ensure that defendants reasonably can anticipate when

15   their conduct may give rise to liability …. " <u>Schwenk v. Hartford</u>, 204 F.3d 1187,

16   1197 (9th Cir. 2000).

17          Thus, a constitutional right is clearly established if it was "sufficiently clear

18   that every reasonable official would [have understood] that what he is doing

19   violates that right." <u>Hines v. Youseff</u>, 914 F.3d 1218, 1229 (9th Cir. 2019)

20   (quoting <u>Reichle v. Howards</u>, 566 U.S. 658, 664 (2012)).  A right is clearly

21   established if "at the time of the officer's conduct, … every reasonable official

22   would understand that what he [wa]s doing' [wa]s unlawful." <u>District of Columbia</u>

23   <u>v. Wesby</u>, 583 U.S. 48, 63 (2018) (quoting <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 741

24   (2011).  In contrast, "qualified immunity is inappropriate where the preexisting

25   law was sufficient to provide the defendant with 'fair warning' that his conduct

26   was unlawful." <u>Schwenk</u>, 204 F.3d at 1197.  "Put simply, qualified immunity

27   protects all but the plainly incompetent or those who knowingly violate the law."

28   <u>Mullenix</u>, 577 U.S. at 12 (citations omitted).

Given this emphasis on notice, clearly established law cannot be framed at a "high level of generality." <u>Ashcroft v. al-Kidd</u>, 563 U.S. at 742. In defining the right at issue, courts must look at the law in the "specific context" of the case, and avoid broad, general propositions. <u>Mullenix</u>, 577 U.S. at 12. While it may be clearly established that prisoners have a right to be free of cruel and unusual punishment, that does not mean that qualified immunity never bars Eighth Amendment claims. Rather, qualified immunity recognizes that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine … will apply to the factual situation the officer confronts." <u>Id.</u>

In the specific context of COVID-19, some courts have rejected qualified immunity because existing precedent clearly established inmates' right to protection from heightened exposure to a serious communicable disease. <u>See</u>, e.g., <u>Maney v. Oregon</u>, No. 20-00570, 2024 U.S. Dist. LEXIS 94037 at *96 (D. Or. Apr. 10, 2024) (collecting cases). In March 2020, case law may have been clear that correctional officers needed to do *something* to protect inmates from COVID-19 once they appreciated its seriousness. But such generalities do not inform whether a reasonable correctional officer would have known in March 2020 that specific efforts to combat COVID-19 in (like reducing a dormitory's population by 10%, screening inmates with temperature checks, housing inmates who had tested positive together in dormitories rather than moving them to cell housing, etc.) were so ineffective as to be unconstitutional.

Plaintiff argues that the Ninth Circuit has rejected qualified immunity for COVID-19 claims, but he reads recent Ninth Circuit cases too broadly. <u>Polanco v. Diaz</u> dealt with the May 2020 transfer of 122 CIM inmates to San Quentin State Prison where there were no known cases of COVID-19. The transfer "sparked an outbreak of COVID-19 at San Quentin that ultimately killed one prison guard and over twenty-five inmates." <u>Polanco v. Diaz</u>, 76 F.4th 918, 923 (9th Cir. 2023). The guard's family members sued the prison officials, claiming that the officials

violated the guard's due process right to be free from state-created danger.  The officials moved to dismiss, arguing that they were entitled to qualified immunity.  Id.

The Ninth Circuit found that the prison officials overseeing the transfer did not have qualified immunity.  The Ninth Circuit analyzed cases about the state-created danger doctrine and determined it was clearly established that public officials could be liable for injury to a public employee if, among other circumstances, they knew that (1) the harmed party would encounter the relevant danger in the course of carrying out employment duties in a correctional facility; and (2) the danger was a potentially fatal illness caused by breathing contaminated air.  Id. at 931.  The facts in Polanco showed such knowledge.  The transferred inmates "had not been tested for COVID-19 for over three weeks, and none of the transferred inmates were properly screened for symptoms."  Id. at 923.  Some inmates exhibited symptoms during the long bus ride, but they were not quarantined upon arriving at San Quentin.  Id.  A Marin County public health official provided specific recommendations for how to handle the transfer more safely, but the defendants "did not heed his advice."  Id. at 924.

In Hampton v. California, 83 F.4th 754 (9th Cir. 2023), the Ninth Circuit considered claims arising out of the same transfer brought by the wife of one of the San Quentin inmates who died.  The defendants in that case argued that they should receive qualified immunity because they could not have known whether it was better to keep the high-risk inmates at CIM or transfer them to San Quentin.  The Ninth Circuit rejected this argument, reasoning as follows:

> Plaintiff does not challenge Defendants' decision to transfer inmates
> out of CIM.  Rather, Plaintiff challenges decisions that Defendants
> made in carrying out the transfer that increased the risk to San
> Quentin inmates without decreasing the risk to the transferred
> inmates.  Those decisions include: (1) transferring inmates to San

24

1   Quentin, as opposed to a prison with architecture more conducive to

2   quarantining a large group of inmates; (2) transferring inmates

3   without proper testing or screening; (3) exceeding CDCR's COVID-

4   capacity limits on the buses; and (4) failing to enact post-transfer

5   safety protocols such as mandatory masking.  In other words, as

6   alleged, a good option did exist; the Complaint suggests that, had

7   Defendants tried, they could have moved the CIM inmates without

8   exposing other inmates to an unreasonable risk.

9   Id. at 770-71.

10                    b.    The Housing and Cleaning Supplies Claim.

11   Here, in March or April 2020, Defendant Amis received from CIM's

12   medical staff a list of inmates eligible to move to cell housing.  (TAC at 8.)  She

13   picked fifteen from Facility-A's population of high-risk medical inmates as the

14   first to transfer to cell housing, reassuring Plaintiff that move inmates would soon

15   be moved.  (TAC at 7, 9.)  In April 2020, did any clearly established law tell

16   Defendant Amis that she was violating Plaintiff's constitutional rights by not

17   prioritizing him over inmates with other conditions, like Valley Fever?  No.

18   Similarly, once Plaintiff tested positive for COVID-19 in early May 2020 and

19   recovered, did any clearly established law tell Defendant Amis that she was

20   violating Plaintiff's constitutional rights by not moving him to cell housing?  No.

21   Plaintiff's factual allegations admit that in April 2020, CIM's leadership had

22   already started to reduce the population of each dormitory, CIM had to deal with

23   hundreds of high-risk medical inmates, the housing units were being cleaned twice

24   per day, CIM's high-ranking medical staff believed that herd immunity could be

25   beneficial, Plaintiff had "mild" COPD, Plaintiff had access to Facility-A's medical

26   clinic, and Plaintiff did not have any symptoms of COVID 19 when he interacted

27   with Defendant Guzman on March 31, 2020, or with Nurse Payne on April 11,

28   2020.  (TAC at 20.)  Given these facts, a reasonable facility captain in Defendant

25

1  Amis's position would have had no reason to believe that she was violating

2  Plaintiff's constitutional rights by housing him in the Facility-A dormitory.

3  c.  The Mask Claim.

4  In March 2020, did any clearly established law tell Defendant Guzman that

5  he was violating Plaintiff's constitutional rights by enforcing CDCR rules against

6  inmates wearing bandanas covering their faces in common areas?  No.  As

7  discussed above, in March 2020, a reasonable officer could have believed that

8  requiring inmates to be unmasked in common areas would not significantly

9  increase their risk of COVID-19 infection.

10  **C. <u>Leave to Amend Would be Futile.</u>**

11  Pursuant to Federal Rule of Civil Procedure 15(a)(2), district courts should

12  grant leave to amend a complaint "when justice so requires," because "the purpose

13  of Rule 15 ... [is] to facilitate decision on the merits, rather than on the pleadings or

14  technicalities."  <u>Lopez v. Smith</u>, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc)

15  (quoting <u>Noll v. Carlson</u>, 809 F.2d 1446, 1448 (9th Cir. 1987)).  The Ninth Circuit

16  has held that "'[t]his policy is to be applied with extreme liberality.'"  <u>Eminence</u>

17  <u>Capital, LLC v. Aspeon, Inc.</u>, 316 F.3d 1048, 1051 (9th Cir. 2003) (quoting <u>Owens</u>

18  <u>v. Kaiser Found. Health Plan, Inc.</u>, 244 F.3d 708, 712 (9th Cir. 2001)).  But courts

19  may deny leave to amend for a number of reasons, including "undue delay, bad

20  faith or dilatory motive on the part of the movant, repeated failure to cure

21  deficiencies by amendments previously allowed, undue prejudice to the opposing

22  party by virtue of allowance of the amendment, [and] futility of amendment."

23  <u>Eminence Capital, LLC v. Aspeon, Inc.</u>, 316 F.3d at 1052 (citing <u>Foman v. Davis</u>,

24  371 U.S. 178, 182 (1962)).

25  Futility alone is enough to deny a motion for leave to amend.  <u>Nunes v.</u>

26  <u>Ashcroft</u>, 375 F.3d 805, 808 (9th Cir. 2004) (citing <u>Bonin v. Calderon</u>, 59 F.3d

27  815, 845 (9th Cir. 1995), <u>superseded by statute on other grounds</u>, Antiterrorism

28  and Effective Death Penalty Act of 1996, 110 Stat. 1226 (1996)).  A proposed

1  amendment is futile if no additional facts can cure the defect.  "A <u>pro</u> <u>se</u> litigant is
2  entitled to an opportunity to amend unless it is absolutely clear that no amendment
3  can cure the defect."  <u>Walker v. Beard</u>, 789 F.3d 1125, 1139 (9th Cir. 2015).

4       There are no facts Plaintiff could add that would demonstrate that
5  Defendants (1) acted with deliberate indifference; or (2) are not entitled to
6  qualified immunity.  He has had multiple opportunities to amend.  The inescapable
7  fact is that Plaintiff contracted COVID-19 very early in the pandemic.  While
8  leadership at CIM could have made different choices (and perhaps better choices
9  with 20/20 hindsight), Plaintiff cannot allege facts showing that the choices they
10  made in March and April 2020 were unconstitutional.

11  **VI.**

12  **STATE LAW CLAIMS**

13       A district court "may decline to exercise supplemental jurisdiction over a
14  [state law] claim" if "the district court has dismissed all claims over which it has
15  original jurisdiction."  28 U.S.C. § 1367(c)(3).

16       Having found that the TAC fails to state a federal claim, this R&R
17  recommends declining to exercise supplemental jurisdiction over Plaintiff's state
18  law claims for negligence and IIED.

19  //
20  //
21  //
22  //
23  //
24  //
25  //
26  //
27  //
28  //

# VII.

## RECOMMENDATION

IT IS THEREFORE RECOMMENDED that the District Court issue an Order: (1) approving and accepting this R&R; (2) granting Defendants' Motion to Dismiss the TAC (Dkt. 65); (3) dismissing all federal claims with prejudice; and (4) dismissing all state law claims without prejudice but without further leave to amend in this action.


DATED: July 22, 2024

*Karen E. Scott*

KAREN E. SCOTT
United States Magistrate Judge


## NOTICE

Reports and Recommendations are not appealable to the Court of Appeals but are subject to the right of any party to timely file objections as provided in the Federal Rules of Civil Procedure and the instructions attached to this Report.  This R&R and any objections will be reviewed by the District Judge whose initials appear in the case docket number.